# Contract Bullet Points

# Cardinal Health*

# and

# Saleaumua Group
# (7 Medicine Shoppe locations)

# January 20, 2006

Case 4:08-cv-00848-ODS   Document 1-1   Filed 11/12/08   Page 1 of 16

To: January 28, 2005
Prepared For: Don Salameh via Medicine Shoppe

## Salameh Inc.

### Cost of Goods Total Net Purchases:

| Purchases: | | | | |
|---|---|---|---|---|
| | $1,110,100.00 | | | |
| % Generic Purchases @ 12.5% (The swing get higher as generic % goes, see chart to the right) | -1.86% | $20,460.00 | per_case | 27%,560.00 |
| DSES Incentive | -1.16% | $12,180.00 | $6,100.00 | $141,900.00 |
| | -0.39% | $3,850.00 | $6,300.00 | $18,160.00 |
| Invoice Cost of Good from Cardinal Health | -3.31% | $ 34,100.00 | $ 409,200.00 | $ 1,227,600.00 |

### Generic Utilization Incentive Matrix

| | | | |
|---|---|---|---|
| 12.50% - 12.99% | -1.10% | | -3.31% |
| 13.00% - 13.49% | -1.18% | | -3.34% |
| 13.50% - 13.99% | -1.24% | | -3.45% |
| 14.00% - 14.49% | -1.33% | | -3.54% |
| 14.50% - 14.99% | -1.38% | | -3.56% |
| 15.00% - 15.49% | -1.48% | | -3.69% |
| 15.50% - 15.99% | -1.54% | | -3.76% |
| 16.00% - 16.49% | -1.62% | | -3.83% |
| 16.50% - 16.99% | -1.71% | | -3.92% |
| 17.00% - 17.49% | -1.82% | | -4.03% |
| 17.50% - 17.99% | -1.86% | | -4.10% |
| 18%+ | -1.88% | | -4.19% |

### Medicine Shoppe and Cardinal Health Added Incentives:

| | | |
|---|---|---|
| Medicine Shoppe eRx Network Switching Fee Incentive (for Cardinal Primary Customer) | $ 2,000.00 | $ 7,000.00 |
| Medicine Shoppe High-Speed Internet up to $125 per store (for Cardinal Primary Customer) | $ 350.00 | $ 1,250.00 |
| Medicine Shoppe PDX Conversion Incentive (for Cardinal Distribution Primary Customer) | | $ 24,580.00 |
| Cardinal Health PDX Conversion Incentive | | $ 140,000.00 |
| Cardinal Health Conversion Incentive | | $ 300,000.00 |
| | Total | $ 53,130.00 |

### Savings between Cardinal and McKerron over 3 years

| | | |
|---|---|---|
| Cost of Good Savings (Cardinal @ -3.31%) (McKesson @ -1.85%) | $ 1,164,750.00 | $ 724,000.00 |
| MSI Incentive for Cardinal Primary Stores | $ 117,100.00 | - |
| Release of Pharmaserve Computer System Contract | - | $ 120,000.00 |
| PDX Conversion Incentive | $ 140,000.00 | - |
| Conversion Incentives | $ 300,000.00 | $ 350,000.00 |
| Total | $ 1,853,360.00 | $ 1,357,600.00 |

Variance and Savings by being Primary with Cardinal Health for the next (3) Three years = $510,340.00

## Questions

1. **MSI will pay monthly DSL costs for franchisee.** (Example: If DSL were $40/mnth, then $40 x 12mnths x 7stores would be $3,360 per year or $10,080 for the 3 year contract.)

   YES. This is benefit is paid to franchisees who support our primary vendor (purchase from Cardinal primary) and who are current with their payments to MSI. This benefit is <u>up to $125 per month per store</u>. The cost reimbursed is the actual. We prefer to have this billing consolidated with other pharmacies invoices to provide efficiency to us in the payment process.

2. **MSI will pay to ensure DSL lines are set up in each store.**

   YES. MSI believes that each and every pharmacy should have high-speed Internet connections (DSL, Cable, etc.). MSI will pay for the cost of installation and activation of these lines.

3. **MSI will pay switching fees.** (Please provide vendor name we need to "switch" to for this payment.)

   YES. This benefit is paid to franchisees on the traditional Medicine Shoppe franchise agreement who are participants in the National Marketing Program and who are current on payments to MSI. For reimbursement, Medicine Shoppe pharmacies who meet this criteria must use the designated switching vendor as outlined in the National Marketing Program participation agreement. The designated vendor is eRx Network. As an added benefit the cost for switching from eRx includes pre and post editing. So this is also paid for for these stores. If MSI does not pay on behalf of the franchisee, the cost to the franchisee for switching and pre and post editing is a combined $.045 per transaction. As combined system volume increases with eRx, this rate could drop to $.03 per transaction.

4. **MSI will discount the PDX purchase price at $3,500.00/system.** (A total of $24,500 if purchasing for 7 stores.)

   YES. This is the current incentive for PDX and POS. The $3,500 per system is the combination of $2,000 for PDX, and $1,500 for POS.

5. **MSI will work Cardinal** will set-up customer's own acquisition cost in the PDX system for more accurate reporting.

   YES. MSI will work with Cardinal to provide acquisition costs for each pharmacy on the PDX system.

In addition, Dan has requested that Cardinal include the following in the current offer:

1. **Cardinal will assist Franchisee in minimizing the costs to terminate the McKesson Leases.**

   A $20,000 per pharmacy location will be provided to Saleaumua Group for conversion of Pharmacy software to PDX. ($140,000)

2. **MSI and Cardinal** will cover the costs of Dan & 3 members of management team to attend the Cardinal trade show (hotel & airfare) each year for the 3 years of the contract.

   YES. In keeping with the RBC Generic program this will be provided.

3. **Cardinal will provide an upfront dollar incentive in the amount of $300,000.**

   YES. This money is in addition to the $140,000 PDX incentive.

---

TOTAL of $440,000 in upfront money will be provided to the Saleaumua Group upon receiving a signed wholesale agreement.

1

Case 4:08-cv-00848-ODS   Document 1-1   Filed 11/12/08   Page 3 of 16

# PRIME VENDOR AGREEMENT

This Prime Vendor Agreement (the "Agreement") is made January 20, 2006, between Saleaumua Group ("Buyer") and Cardinal Health* ("Cardinal Health"), who hereby agree as follows:

**SECTION I – General Purchase Information**

1. Buyer's Primary Monthly Volume: *$1,100,000*
   (Primary is defined as a customer purchasing a minimum of 95% of all available RX & OTC items.)

2. Buyer's Generic Sales per Month (% of Rx) shall equal: *12.00%*

3. Buyer's Rx Cost of Goods: (See Pricing Matrix: Exhibit A)

4. Buyer's OTC Cost of Goods: (See Pricing Matrix: Exhibit A.)

5. Description of Initial payment terms.
   (a) *Initial Payment Terms.* The payment terms initially applicable to Buyer will be semi-monthly as follows: Buyer may elect to cause Cardinal to receive payment in full: (1) by not later than the twenty-fifth (25th) day of each calendar month of the amount due for all Merchandise delivered and services provided during the first (1st) fifteen (15) days of such calendar month, and (2) by not later than the tenth (10th) day of each calendar month, of the amount due for all Merchandise delivered and services provided during the period beginning on the sixteenth (16th) day of the preceding calendar month and ending on the last day of such preceding calendar month. Buyer will deliver to Cardinal credit information requested by Cardinal not less than thirty (30) days prior to its initial purchases of Merchandise under this Agreement. Following the determination of Buyer's initial payment terms, all payments for the Merchandise will be due in accordance with those terms unless and until otherwise agreed by Buyer and Cardinal. Buyer may from time to time (but not more often than once per calendar quarter) request that its payment terms be changed to one of the options set forth in Subsection (b) as to future Merchandise purchases, subject to Cardinal's prior written consent. In such event, Buyer acknowledges and agrees that Buyer's Cost of Goods may be adjusted by Cardinal to reflect Buyer's new payment terms and credit considerations deemed relevant to Cardinal.
   (b) *Optional Payment Terms.* Subject to Subsection (a), Buyer may elect to cause Cardinal to receive payment on a weekly or monthly basis.
   (i) *Weekly.* If Buyer selects a weekly payment option, Buyer will cause Cardinal to receive payment in full by the Friday of each week of the amount due for all Merchandise delivered and services provided during the immediately preceding week (i.e., Monday through Friday).
   (ii) *Monthly.* If Buyer selects a monthly payment option, Buyer will cause Cardinal to receive payment in full by the tenth (10th) day of each calendar month, of the amount due for all Merchandise delivered and services provided during the immediately preceding calendar month.
   (c) *Cost of Goods Adjustments.* At the end of each rolling quarter, Cardinal will evaluate Buyer's payment history based on actual weighted average payment days and average Qualified Monthly Purchases. Prospective adjustments to the then-applicable Cost of Goods will be made as appropriate. No retroactive adjustment will be applied with respect to purchases by Buyer, absent bad faith on the part of Buyer.
   (d) *Submission of Financial Statements.* Buyer will provide Cardinal with financial statements and/or tax returns with all notes and schedules and such further information as Cardinal may reasonably request from time to time.

6. This agreement is contingent upon Cardinal Health being appointed as the Prime Vendor for the purchase of pharmaceutical and HBA/OTC products. The definition of a Prime Vendor does not include loading other competing generic vendor contracts.

7. Three (3) year agreement beginning February 1, 2006.

2

## SECTION II – Terms, Conditions and Disclosures

1.  Buyer will pay a service charge calculated at the rate of 1.5% per month (or the maximum rate allowed by law, if such rate is less than 1.5% per month) on any amount not paid by Buyer to Cardinal Health when due under the terms of this Agreement from the first day of delinquency until such amount is paid in full, along with reasonable attorney fees associated with any such delinquency. Failure or delay by Cardinal Health to bill Buyer for any such service charge will not waive Cardinal Health's right to receive the same. Cardinal Health retains the right to adjust Buyer's payment terms, place Buyer on C.O.D. status, modify Buyer's cost of goods, limit or terminate the extension of credit and/or refuse orders from Buyer if Cardinal Health has not received payment when due for products delivered to Buyer under this Agreement (the "Products") or services provided to Buyer under this Agreement, or based upon credit considerations deemed relevant by Cardinal Health. Until the Product is paid for in full, Cardinal Health retains, and the Buyer hereby grants Cardinal Health, a security interest in the Product. In the event of default in payments on any invoices, Cardinal Health shall have the right to declare all invoices immediately due and payable.

2.  Cardinal Health will recognize and administer manufacturer pricing contracts between Buyer and any manufacturer (collectively, "Manufacturer Contracts"): (i) subject to their continued validity in accordance with applicable laws, (ii) provided such manufacturer is a vendor in good standing with Cardinal Health and (iii) subject to such credit considerations concerning the applicable manufacturers as Cardinal Health may consider appropriate. However, if manufacturers' chargebacks for contract items submitted by Cardinal Health are disallowed, uncollectable, or unreconcilable, then the applicable charge will be billed back to Buyer. Buyer will notify Cardinal Health of all applicable pricing information included in the Manufacturer Contracts, including renewals, replacements or terminations of Manufacturer Contracts not less than forty-five (45) days prior to the effective date of such Manufacturer Contract, renewal, replacement or termination.

3.  All Products shall be shipped FOB destination. Buyer's obligation to pay for Product begins on the date of shipment. Notwithstanding any other provision in this Agreement, Cardinal Health reserves the absolute right to determine what Products it will carry. No Schedule II orders will be delivered other than in compliance with DEA regulations.

4.  In general, Cardinal Health will accept Products for return from Pharmacies in accordance with the Standard Cardinal Health Returned Goods Policy as is in effect from time to time. Buyer must notify Cardinal Health within 48 hours of receipt of any discrepancies or shortages on the order. If Buyer does not notify Cardinal Health in a timely manner, Buyer may not receive credit for any such discrepancies or shortages.

5.  Buyer represents and warrants to Cardinal Health that Buyer and the Pharmacies have complied with, and are currently and will be at all times during the term of this Agreement in compliance with, all applicable licensure requirements of all applicable federal, state and local governmental authorities. Prior to purchasing Rx Products from Cardinal Health hereunder, and at all times during the term of this Agreement, Buyer will provide Cardinal Health with copies of all such licenses and any renewals, revocations, changes or notices related thereto.

6.  All Applicable taxes, including Federal Excise Tax, will be collected as part of the sale.

7.  Without limiting Cardinal Health's rights under law or in equity, Cardinal Health and its affiliates, parent or related entities, collectively or individually, may exercise a right of set-off against any and all amounts due Buyer. For purposes of this Section, Cardinal Health, its affiliates, parent or related entities shall be deemed to be a single creditor.

8.  THERE ARE NO EXPRESSED OR IMPLIED WARRANTIES, INCLUDING ANY WARRANTY OF MERCHANTABILITY, NON-INFRINGEMENT OR FITNESS FOR A PARTICULAR PURPOSE. CARDINAL HEALTH SHALL NOT BE LIABLE FOR INCIDENTAL, CONSEQUENTIAL, SPECIAL OR PUNITIVE DAMAGES.

9.  If and to the extent any discount, credit, rebate or other purchase incentive is paid or applied by Cardinal Health with respect to the Products purchased under this Agreement, such discount, credit, rebate or other purchase incentive shall constitute a "discount or other reduction in price," as such terms are defined under the Medicare/Medicaid Anti-Kickback Statute (42 U.S.C. § 1320a-7b(b)(3)(A) and the "safe harbor" regulations regarding discounts or other reductions in price set forth in 42 C.F.R. § 1001.952(h)), on the Products purchased by Buyer or any Pharmacy under the terms of this Agreement. Buyer may have an obligation to accurately report, under any state or federal program which provides cost or charge based reimbursement for the products or services covered by this Agreement, or as otherwise requested or required by any governmental agency, the net cost actually paid by Buyer and/or each Pharmacy.

Case 4:08-cv-00848-ODS   Document 1-1   Filed 11/12/08   Page 5 of 16

10. Buyer, intending to be legally bound, agrees to all the terms and conditions of this Agreement. This Agreement, together with all invoices, purchase orders, and the exhibits and addenda thereto constitute the entire agreement and understanding of the parties with respect to the subject matter hereof and supersede all prior written and oral agreements, proposals, bids/bid responses, and understandings between the parties relative to the subject matter hereof. No changes to this Agreement or any purchase orders will be made or be binding upon either party unless made in writing and signed by each party. By signing this Agreement, Cardinal Health and Buyer each represent that it has the authority to bind its respective party to this Agreement.

Saleaumua Inc.                                          Cardinal Health*
                                                        7000 Cardinal Place
*R. DAN SALEAUMUA*                                      Dublin, Ohio 43017
Telecopy: _____                                       Telecopy: (614) 757-6000

By _R. DAN SALEAUMUA_                                   By _Pete Pfankuch_
Title _PRESIDENT_                                       Title _Business Development Manager_
Date _1.23.06_                                          Date _January 20th, 2006_

*The term "Cardinal Health" means the following pharmaceutical distribution companies: Cardinal Health 106, Inc. (formerly known as James W. Daly, Inc.), a Massachusetts corporation (Peabody, Massachusetts); Cardinal Health 103, Inc (formerly known as Cardinal Southeast, Inc.), a Mississippi corporation (Madison, Mississippi); Cardinal Health 110, Inc. (formerly known as Whitmire Distribution Corporation), a Delaware corporation (Folsom, California) and any other subsidiary of Cardinal Health, Inc., an Ohio corporation ("CHI"), as may be designated by CHI.

4

## EXHIBIT A

### Pricing

This agreement is contingent upon Cardinal Health being appointed as the Prime Vendor for the purchase of pharmaceutical and HBA/OTC products. The definition of a Prime Vendor does not include loading other competing generic vendor contracts.

| | |
|---|---|
| $1,000,000 - $1,499,999 | -1.86% |
| $1,500,000 - $1,999,999 | -1.91% |
| $2,000,000 - $2,999,999 | -1.96% |

### Processed and Reviewed Quarterly

**Generic % to RX Incentive**

| | |
|---|---|
| 3.00% to 3.49% | Add 0.80% to above |
| 3.50% to 3.99% | Add 0.70% to above |
| 4.00% to 4.49% | Add 0.60% to above |
| 4.50% to 4.99% | Add 0.50% to above |
| 5.00% to 5.49% | Add 0.40% to above |
| 5.50% to 5.99% | Add 0.30% to above |
| 6.00% to 6.49% | Add 0.20% to above |
| 6.49% to 6.99% | Add 0.10% to above |
| | |
| 12.00% to 12.49% | COG decrease of 1.05% |
| 12.50% to 12.99% | COG decrease of 1.10% |
| 13.00% to 13.49% | COG decrease of 1.18% |
| 13.50% to 13.99% | COG decrease of 1.24% |
| 14.00% to 14.49% | COG decrease of 1.33% |

The scale will be provided at signing of deal

### Site Incentive (based on the Medicine Shoppe contract)

COG decrease of 0.35%

### Off Invoice Cost of Goods

### COST MINUS 3.31%

Notwithstanding the foregoing, the following Merchandise will not be available for purchase in accordance with the cost of goods set forth above, but instead will be special net billed:

Generic Rx Products
Home health care/durable medical equipment
Certain selected over-the-counter Merchandise
Merchandise subject to a Manufacturer Contract

**EXHIBIT B**

## Other Services

**Base Service Package**

| Programs and Services | Frequency |
|---|---|
| EOE Machines | One per store |
| Shelf Labels | With each order |
| Price Stickers | With each order |
| Auto Generic Substitution Program | Ongoing |
| Auto Repack Substitution Program | Ongoing |

| Programs and Services | Frequency |
|---|---|
| Category Purchase Summary | Monthly, upon request |
| Item Purchases Report | Monthly, upon request |
| Rx Velocity Report - Top 200 Items | Quarterly, upon request |
| Generic Purchase Report | Quarterly, upon request |
| Price Change Notification | Weekly, upon request |
| Controlled Substance Variance Report | Monthly, upon request |
| DEA Report | Monthly, upon request |

**EXHIBIT C**

### Service Level Definition

For purposes of this Agreement, the service level percentage will be calculated by dividing total lines of Rx Products shipped by the number of lines of Rx Products ordered. The following items will be excluded from the service level calculation:

1. Manufacturer back orders/temporary outs;
2. Non-stock and/or discontinued items due to non-movement or discontinuation by manufacturer;
3. Rx Products shipped within two (2) working days of initial order (including those filled by an affiliate of Cardinal Health), which will instead be counted as a line filled;
4. Items where a Pharmacy has failed to provide accurate usage figures;
5. Items where a Pharmacy's historical demand is exceeded by 125% over the preceding two (2) months; and
6. Same item ordered more than once within three (3) days.

The service level guaranty in this Agreement for Buyer will commence ninety (90) days following the later of the Commencement Date or Cardinal Health's receipt of accurate usage data. The service level guaranty for Pharmacies added to this Agreement after the Commencement Date will commence sixty (60) days following receipt by Cardinal Health of accurate usage data. This will allow Cardinal Health to gain usage information and adjust inventory levels appropriately.

Upon Buyer's request, if Cardinal Health does not meet its service level for any quarter, Cardinal Health and Buyer will jointly develop a service level action plan for the following quarter. During the implementation of the service level action plan, Buyer may not terminate this Agreement for cause.

Buyer will notify Cardinal Health at least forty-five (45) days prior to the expiration of any manufacturer's contract which is being replaced with a different contract, and will cooperate with and assist Cardinal Health in disposing of any excess inventory of Merchandise previously stocked at Buyer's or a Pharmacy's request. Failure to comply with these notice requirements will entitle Cardinal Health to discontinue the service level guaranty to the Pharmacies until ninety (90) days after delivery of accurate usage data for the new items.

**EXHIBIT D**

## Cardinal Health Pharmaceutical Distribution
## Medicine Shoppe Returned Goods Policy

Products in "merchantable condition" (as defined below) and originally purchased from Cardinal Health may generally be returned to the customer's servicing Cardinal Health distribution center in accordance with, and subject to, the terms and conditions of this policy.

| Return Made Within: | Normal Credit Amount: |
|---|---|
| 1 – 180 Days from Invoice Date | 100% of original invoice amount paid by customer. This policy covers all order shortages, filling errors and damage if reported within two (2) business days and such products are returned within ten (10) business days of the date of the applicable invoice. |
| 180+ Days from Invoice Date | 90% of original invoice amount paid by customer. Provided, however, if applicable mark-up is greater than 0%, credit will be based on customer's contract cost or Cardinal Health's then-current base cost, as applicable. |

"*Merchantable condition*" will be determined by Cardinal Health based upon its ability to return the product to its inventory for resale in the normal course of its business, without special preparation, testing, handling, or expense and will **exclude** the following:

A. Any product purchased from any supplier other than Cardinal Health.
B. Any product which has been used or opened; is a partial dispensing unit or unit of sale; is without all original packaging, labeling, inserts, or operating manuals; or that is stickered, marked, damaged, defaced, or otherwise cannot readily be resold by Cardinal Health for any reason.
C. Short-dated (less than seven (7) months expiration dating), outdated, or seasonal products and products purchased on a "special order" basis, including non-stock and drop-shipped products.
D. Any product not intended for return to a wholesaler in accordance with the return policies of the applicable manufacturer.
E. Any product listed by any state or federal regulatory agency as a high-risk pedigree item that is returned without a valid invoice number that cannot otherwise be verified by Cardinal Health.

### Unmerchantable Products

Any product not eligible for return in accordance with this policy (i.e., the product is not in "merchantable condition" as set forth above) will require return directly to the manufacturer. If any such products are returned to Cardinal Health, they will be returned to customer and customer will be assessed an $8.00 per line handling fee, with the exception of stickered products, which will be handled as follows. Cardinal Health will remove the sticker and retain the product, credit the customer (as applicable pursuant to this policy), and customer will be assessed an $8.00 per line handling fee. If the product is damaged during the removal of the sticker, no credit will be issued to customer, the product will be returned to customer, and customer will be assessed an $8.00 per line handling fee.

Any product listed by any state or federal agency as a high-risk pedigree item that is returned without a valid invoice number that cannot otherwise be verified by Cardinal Health will not be issued credit, and will be returned to customer, and customer will be assessed an $8.00 per line handling fee.

Notwithstanding the foregoing, in any case where Cardinal Health accepts the return of such products and agrees to return such products to the applicable manufacturer on behalf of customer (provided the manufacturer allows the return of such products), any credit issued to customer will be determined by Cardinal Health.

### Required Return Documentation

Prior to returning any product to Cardinal Health, customer must execute and deliver to Cardinal Health a **Cardinal Health Returned Goods Authorization Ongoing Assurance** verifying that all returned products have been kept under proper conditions for storage, handling, and shipping.

All requests for credit must be submitted via P.OE, Cardinal.com, CardinalCHOICE®, or approved EDI interface.

8

Case 4:08-cv-00848-ODS   Document 1-1   Filed 11/12/08   Page 10 of 16

A fully completed and signed **Merchandise Return Authorization Form** (the "MRA Form") must accompany all products to be returned. Note: A fully completed MRA Form must include a valid invoice number.

- Returned products associated with an MRA Form without a valid invoice number that can otherwise be verified by Cardinal Health will be charged a 25% re-stocking fee.
- Any credit issued for returned products associated with an MRA Form without a valid invoice number that cannot otherwise be verified by Cardinal Health will be based on Cardinal Health's then-current base cost, minus a 25% restocking fee.
- Where applicable laws, rules or regulations limit the return of specific products, no credit will be issued for returns of those products without a valid invoice number, and in all instances, customer will be assessed an $8.00 per line handling fee.

### Third Party Return Processors

At the request of customer, Cardinal Health will work with third party return processors for returns of unmerchantable products. Such arrangement will be subject to mutually agreed upon terms and conditions, to include administrative fees payable to Cardinal Health.

### Controlled Substances

Credit for the return of controlled substances requires a separate MRA Form and such returns must comply with all applicable laws, rules and regulations in addition to the terms and conditions of this policy. Schedule II to V controlled substances will be charged the applicable restocking fees, plus an $8.00 per line handling fee.

### Refrigerated, Chemotherapy and Hazardous Products

Refrigerated, chemotherapy and hazardous products will be charged the applicable restocking fees, plus an $8.00 per line handling fee. All such products must be returned in packaging that complies with applicable regulatory requirements. All such products that are not returned in packaging that complies with applicable regulatory requirements will be considered damaged and unsaleable. This product will be destroyed, no credit will be issued and customer will be assessed an $8.00 per line handling fee.

### Shorts and Damaged Products

Claims of order shortages (e.g., products invoiced but not received), filling errors and damage must be reported within two (2) business days from the applicable invoice date, or no credit will be issued. Returns of damaged products or products shipped in error must be received by the Cardinal Health servicing distribution center within ten (10) business days from the applicable invoice date, or no credit will be issued. Controlled substance shortage claims must be reported immediately per DEA requirements. In all instances, credit will not be issued until verification of the claim by Cardinal Health.

No deductions may be taken by customer until a valid credit memo is issued by Cardinal Health.

### Shipping of Return Products

Products to be returned must be placed in a proper shipping container and signed for by the driver when picked up.

Signed MRA Forms shall be included in totes with the returned products. Only one (1) MRA Form shall be included in each tote.

- If the MRA Form is not signed, no credit will be issued. The products will be returned to the customer and customer will be assessed an $8.00 per tote handling fee.
- If there is more than one (1) MRA Form per tote, customer will be assessed an $8.00 handling fee for each additional MRA Form.
- If the MRA Form is not inside the tote with the returned products, Cardinal Health will attempt to identify the customer that returned the products. The tote will then be returned to the customer with a request for a completed MRA Form(s), and customer will be assessed an $8.00 per tote handling fee.
- No credit will be issued for products returned but not listed on the accompanying MRA Form. Such products will be returned to the customer, and customer will be assessed an $8.00 per line handling fee.

All MRA Forms will be reviewed by Cardinal Health for compliance with this policy. The acceptability and valuation of any return is at the sole discretion of Cardinal Health.

9

Case 4:08-cv-00848-ODS   Document 1-1   Filed 11/12/08   Page 11 of 16

Products must be returned to the customer's servicing Cardinal Health distribution center within thirty (30) days from the date of customer's request for an MRA Form, or no credit will be issued.

In addition to the requirements set forth in this policy, Customer shall comply with all return procedures required by the Cardinal Health servicing distribution center.

**Other Restrictions**

Products with an invoice price of $1.00 or less will not be accepted for return. If any such product is returned, no credit will be issued and the product will not be retuned to the customer.

Excessive returns may result in higher restocking fees as deemed necessary by Cardinal Health.

This policy is subject to change without notice by Cardinal Health. This policy is further subject to modification as may be deemed necessary or appropriate by Cardinal Health to comply with applicable federal and/or state regulations, FDA guidelines, state law, and other restrictions applicable to returned products.

**EXHIBIT E**

## Cardinal Health Return Goods Authorization
## Ongoing Assurance

The undersigned Buyer ("Buyer") of one (1) or more of the Cardinal Health companies identified below ("Wholesaler," whether one (1) or more) hereby agrees that this document is being delivered to confirm Buyer's compliance with applicable federal, state, and local laws / guidelines concerning returned goods and will apply to all returns by Buyer to Wholesaler from time to time and will supersede any inconsistent provisions which may be contained in any credit request, purchase order, or other documents pertaining to the supply relationship between Buyer and Wholesaler.

1. Buyer represents, warrants, and guarantees to Wholesaler that: (a) each such return will be made only to the specific Wholesaler from which the item was originally purchased; (b) each such return will be accompanied by Wholesaler's credit request form (the "Return Form"), which will specify both Buyer's and Wholesaler's name and address, the date of the return, the quantity and description of the product returned, and such other information as may reasonably be requested on Wholesaler's Return Form; (c) Buyer will retain a copy of each Return Form and related credit memo and make such documentation available to the manufacturer and to authorized federal, state, and local law enforcement officers upon request; (d) the credit claimed or accepted by Buyer for any such return will not exceed the original purchase price paid to Wholesaler; and (e) all merchandise returned to Wholesaler has been stored and handled by Buyer in accordance with all applicable federal, state, and local laws, manufacturer guidelines when disclosed to Buyer by the manufacturer or wholesaler, and good trade practices, and such merchandise has not been adulterated or misbranded by Buyer within the meaning of the Federal Food, Drug, and Cosmetic Act and meets all FDA, state, and other applicable requirements and guidelines.

2. Buyer will indemnify and defend Wholesaler against and from any expense, claim, liability, or penalty (including reasonable legal fees) arising from any failure of Buyer to properly comply with the provisions specified in this document.

3. "The term "Cardinal Health" means the following pharmaceutical distribution companies: Cardinal Health 106, Inc. (formerly known as James W. Daly, Inc.), a Massachusetts corporation (Peabody, Massachusetts); Cardinal Health 103, Inc. (formerly known as Cardinal Southeast, Inc.), a Mississippi corporation (Madison, Mississippi); Cardinal Health 110, Inc. (formerly known as Whitmire Distribution Corporation), a Delaware corporation (Folsom, California) and any other subsidiary of Cardinal Health, Inc., an Ohio corporation ("CHI"), as may be designated by CHI.

Dated: Jan. 23, 2006

Buyer's Name (Print): R. Dan Saloumua

By Authorized Signature / Title: _____, PRESIDENT

*Confidential*

# SALEAUMA INC.

*Dan Saleauma*

January 18th 2006


CardinalHealth

# CARDINAL DISTRIBUTION
A Cardinal Health Company


CardinalHealth

# Thank you for this opportunity to serve you!

**Pete Pfankuch** New Business Development Manager
**Leigh Hoy** Sales Consultant
And
**Lee Cox** Cardinal Health, VP
**Michael Synor** Sales Director
**Ginger Hibbert** Inside Sale Consultant
**Fawn Alvarez** Customer Service Rep.

## Cardinal Distribution

## *Cost of Good Matrix*

Cost of Goods is based on monthly purchase. SALEAUMA INC. will be in keeping with the MSI COG Contract.
Current Invoice COG = -3.31% with a 12.5% or greater Generic Pull Through

## Conversion to Cardinal

-Cardinal will require a new Credit Application on file.
-Three (3) year Prime Vendor Agreement Required
-$440,000 Credit on purchase by Saleauma Inc., from Cardinal on a time table that best meets the customer (Saleauma Inc.) terms.

## Returns Policy:

180 days from invoice = 100% return
Greater than 180 days (merchantable) = 90% return
MSBL product has no time constraints for returns, but must use return reason codes of 11, 12 or 13 only for MSBL returns to process correctly; return strongly encouraged within 12 months of purchase.

"MSI Member"

                                 Saleauma Inc.
                                 (Name of Pharmacy)

By: _____
                                 Authorized Signature

By: _____
                                 Dan Saleauma
                                 Print Name

Date: _____

**Return Fax: (417)889-1095**